No. 82-224

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

---

DENNIS KUIPER,

         Plaintiff and Respondent,

-vs-

THE GOODYEAR TIRE & RUBBER COMPANY, et al.,

         Defendant and Appellant.

---

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable H. William Coder, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Dzivi, Conklin & Nybo; William Conklin argued,
        Great Falls, Montana
        John C. Noonan argued, Kansas City, Missouri
        Kenneth R. Betzler, Akron, Ohio

    For Respondent:

        Conner, Baiz & Olson; Dennis P. Connor argued,
        Great Falls, Montana
        Niewald, Risjord & Waldeck; John C. Risjord argued,
        Kansas City, Missouri

---

        Submitted:    May 12, 1983

        Decided:    November 25, 1983

Filed: NOV 25 1983

*Ethel M. Harrison*

Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Plaintiff, Dennis Kuiper, brought a products liability action against the Goodyear Tire and Rubber Co. (Goodyear) after he was injured while working on a multi-piece truck wheel rim. Following a twenty-five day trial in the Eighth Judicial District Court for Cascade County, the jury awarded plaintiff $325,000 in compensatory damages and $1,500,000 in punitive damages and judgment was entered based upon the jury verdict. The District Court denied a new trial. Goodyear appeals. We reverse and remand for new trial.

On August 13, 1979, plaintiff, a twenty-two year old newly-married man, was employed at an independent Goodyear dealership in Great Falls, Montana, known as Andy's D & K. He had been employed for only a short period of time and was working in the shop as a tire repairman, called a tirebuster. Late in the afternoon of August 13, the service manager instructed Kuiper to do a flat repair on a multi-piece truck tire with a rim known as a Goodyear K-28. Kuiper had never worked on that type of a wheel, so a co-worker, David Huston, helped Kuiper dismount the tire, repair the tube, and instructed Kuiper how to put the tire and rim back together. Huston left to work on another project, and Kuiper assembled the rim and tire and inflated the tire in a safety cage. After the tire was inflated, Kuiper rolled the tire to the truck and proceeded to mount the tire and wheel on the wheel lugs. As he was mounting the tire and wheel the ring explosively separated from the rim base and struck Kuiper in the face. Kuiper suffered

multiple facial fractures, jaw fracture, loss of teeth, diploplia of the right eye, facial paralysis and a cerebral contusion. Doctors testified that as a result of these injuries, Kuiper continued to suffer from facial paralysis, loss of sense of smell and taste, loss of memory and concentration, anxiety, depression and traumatic neurosis. Medical evidence was conflicting as to whether Kuiper had suffered organic brain damage.

After partial recovery, Kuiper returned to work at Andy's D & K as a salesman. He was unable to function as a salesman due to memory lapses and loss of concentration. He next returned to work in the shop but was unable to cope with the anxiety he experienced while working there. Following medical recommendations that he should change occupation, Kuiper enrolled at a vocational technical school in Missoula studying forestry.

On December 28, 1979, Kuiper filed a complaint in District Court against Goodyear. The complaint sought damages from Goodyear as the designer and manufacturer of the K-type wheel, for strict liability for defective design, failure to warn, manufacturing defect and malicious conduct.

Because the case is returned for new trial, we need not review the extensive factual record. Our factual review will be brief with the aim of illustrating the contentions of the parties. The wheel which separated and caused Kuiper's injury is a Goodyear K-type-28, manufactured in March, 1944. The wheel has two parts: (1) a split base (2) a combined slide ring and locking ring. Plaintiff's mechanical engineer witness testified that the most probable cause of the separation was the absence of a portion of the

gutter hook on the split base which serves to hold the slide ring and locking ring in place when the parts are assembled and the tire is inflated. That witness testified that the missing portion of gutter hook was a manufacturing defect which may have been increased with the usage of the wheel, and he further testified that the lock ring was manufactured .032 of an inch too large. He also testified that the missing gutter hook and oversized ring caused the unsafe assembly which explosively separated while Kuiper was mounting the wheel on the truck. He further testified that a locking device patented to Goodyear in the 1930's could have been placed on K-type wheels to decrease the risk of explosive separation.

Goodyear presented expert testimony that the K-type wheel was not defectively designed and that the wheel involved in Kuiper's accident was not defectively manufactured. Goodyear experts testified that the missing gutter hook was caused by wear and that Kuiper should have recognized the dangerous condition of the wheel and not reassembled it. Such experts testified that the K-type wheel is a safe wheel if properly maintained and assembled according to Goodyear's instructions. A Goodyear witness, tire supervisor for a Georgia express company, testified the K-type wheel is safe if properly maintained and assembled, although he testified that his shop had two accidents involving K-type wheels caused by improper mounting procedures.

Kuiper introduced evidence of other accidents involving multi-piece wheels in general and K-type wheels in particular. One exhibit reveals that as of May 1981,

Goodyear had notice of as many as eighty-six other reported accidents involving K-type wheels. No evidence was introduced showing exactly how other accidents occured, nor the age or condition of the exploding wheels. Plaintiff introduced an inter-office memo written by a manager of field engineering of the motor wheel division of Goodyear in which he stated that parts of the multi-piece rim are inherently dangerous both on the highway and in the shop. He said the parts "sometimes catastrophically cease to serve their intended purpose" and that "the time at which the usefulness ceases is dependent on chance, service procedure, maintenance, proper use of tools, and the use, abuse and misuse of which parts have been subjected during their lifetime." That witness estimated the useful life of the average K-type wheel at twelve to fourteen years. The wheel involved in this case was approximately thirty-five years old.

It is significant to note that Goodyear ceased production of the K-type wheel in 1968, prior to any of the incidents referred to in the trial of the case.

With regard to the Goodyear policy of notifying tire repair shops of the necessity of using care in handling the wheels, Goodyear presented evidence showing that Goodyear had distributed a multitude of charts, posters and advertisements which demonstrated the proper assembly of multi-piece rims. A Goodyear witness testified that the charts, posters and advertisements warn that multi-piece rims can be dangerous if they are not properly assembled or if the parts are worn or abused. Goodyear also had available a film entitled, "You May Not Get a Second Chance"

which showed explosive separation of a multi-piece rim. The film was shown at some seminars and was available to independent dealers for a fee. The service manager at Andy's D & K testified there was some of the multi-piece warning posters and literature in the shop, but he did not recall exactly which ones.

In 1977, during the administration of President Carter and subsequent to the problems of the Nixon administration which are later discussed, the Director of the Office of Defects Investigation of the Department of Transportation reopened the K-type wheel investigation. In November, 1979, he transmitted a letter to the Vice President of Goodyear stating:

> "By 1973, inclusive, we have identified at least fourty-two accidents and twelve deaths involving the explosive disassembly of K-type rims. All types of multi-piece rims can be subject to a variety of servicing procedures, including the use of warnings, corroded or mismatched parts. When recognizing this, the significantly higher number of accidents found among K-type rims is totally unacceptable and points to an inherent safety defect in these rims."

He requested Goodyear to notify him within seven working days whether they would conduct a safety recall. Goodyear reponded to that request stating they would attempt to recall the K-type wheels rims by replacing, without charge those manufactured in 1968 or purchased after January 1, 1971. Wheels manufactured prior to 1968 could be replaced with a new type rim at a discounted price. The recall was unsuccessful. Originally Goodyear offered ten percent of cost discount and later raised that to twenty-five percent.

Following are the issues:

1. Did the trial court err in admitting the following

irrelevant and prejudicial evidence in connection with the plaintiff's allegations of political bribery and lying to the Ervin Committee:

(a) the political campaign contributions by Goodyear;

(b) all of plaintiff's references to Watergate;

(c) the DeYoung videotape?

2. Did the trial court err in admitting the following irrelevant and prejudicial evidence of other accidents:

(a) documents mentioning other accidents dissimilar to the plaintiff's accident;

(b) testimony by Youngdahl from a document identified as Phase III;

(c) a video-taped dramatization of other accidents, which was shown to the jury;

(d) the Brandford letter?

3. Did the trial court err in submitting instructions 13, 27 and 41 to the jury:

(a) were instructions 13 and 27 erroneous because they did not include "without substantial change in condition" as an essential element of plaintiff's proof;

(b) did instruction 41 erroneously equate "unjustifiable conduct" with malice?

4. Did the trial court err in submitting the issue of "failure to warn" to the jury?

5. Was the jury verdict influenced by misconduct of the bailiff?

6. Was the jury verdict excessive, based on an unsupported assumption, and inspired by passion and prejudice?

We will discuss those issues which require reversal or which may cause problems on retrial.

Issue 1 relates to plaintiff's opening statement to the jury, plaintiff's evidence and plaintiff's closing argument with regard to an un-taxed slush fund in a Swiss bank account used by Goodyear as contribution to CREEP (Committee to Re-elect the President), extensive references, by name, to those persons involved in the Watergate scandal, with particular emphasis upon those convicted of crimes in the Watergate scandal, a video-tape of Goodyear chairman DeYoung appearing on television before the Ervin Senate Committee to discuss the campaign contribution, and the conviction of Goodyear in regard to that contribution.

The theory upon which the plaintiff contends that all of such matters are admissible is under Section 27-1-221, MCA, which provides that exemplary damages may be allowed where a defendant has been guilty of "oppression, fraud, or malice, actual or presumed." The general standard for the recovery of punitive damages is restated in Graham v. Clarks Fork Nat. Bank (Mont. 1981), 631 P.2d 718, 721, 38 St.Rep. 1140, 1143, 1144, to wit:

> ". . . we stated the general rule respecting punitive awards:
>
> "'To warrant the recovery of such damages the act complained of must not only be unlawful, but must also partake somewhat of a criminal or wanton nature. And it is an almost universally recognized rule that such damages may be recovered in cases, and only in such cases, where the wrongful act complained of is characterized by some such circumstances of aggravation as willfulness, wantonness, malice, oppression, brutality, insult, recklessness, gross negligence, or gross fraud on the part of the defendant.'" (emphasis added)

The Goodyear act complained of is the alleged defective design, failure to warn or manufacturing defect of the K-type wheel. The record fails to disclose any relationship between the political activities of Goodyear and the wheel case at issue here.

We recognize that the purpose of the opening statement is to inform the jury of the evidence to be presented to justify recovery and place it in perspective. In plaintiff's opening statement, it is apparent that the intent was to persuade the jury that the criminal and wanton conduct of Goodyear in making its political contribution to CREEP and supporting the scandalous conduct of the Nixon administration, was a proper reason to conclude that punitive damages should be awarded against Goodyear, regardless of the presence or absence of a direct connection to the design, production and manufacture of the K-type wheel.

Plaintiff's opening statement to the jury fills approximately seventy-two pages of transcript. Over forty of those pages are devoted to a recounting of the political slush fund, the contribution to the Nixon administration, and the Nixon Watergate scandal, with great emphasis placed upon the names of those who were convicted of various crimes in the Nixon administration. Following are illustrative portions of plaintiff's opening statement:

> ". . . It developed that in the 1960's, Goodyear, through their foreign affiliates in Europe, were getting kickbacks or rebates from suppliers to their foreign affiliates, and rather than report them honestly and on the books, they decided not to pay any tax, not to report them on their books, to issue by some kind of a financial controller's gimick [sic] a bank check to the

-9-

subsidiary and aquire the cash rebate. They were always paid in cash, and put it in a secret account that they set up with nothing but a code name. That code name of that account was Goyeda. That bank in Switzerland accumulated the cash then over a period of time.

"One of the purposes, or the one we're concerned with of that cash fund, was to build up a domestic political slush fund in this country. . .

". . .

"The opportunity to use it in influencing domestic politics arose either late 1971 or early 1972. . .

". . .

" . . . In December 1971, the White House operative for personnel, the man who was doing the job in the federal government, he's the key man, was Fred Malek. . .

"Fred Malek was on the Nixon White House Staff in the Office of Management and Budget as the personnel director. If you wanted a fat federal job, you saw Malek . . . you will recall that the Chief of Staff of Nixon's White House was the gentleman named H.R. Haldemann. In December of 1971, Malek suggested in a long memorandum, which is a public government record, that Haldemann allow Malek to set up a program, which he first talked about politicizing the bureaucracy, by which fancy words he meant, 'We're going to make the people who are civil servants in Washington and work in the departments such as the Department of Transportation, work for the re-election of the president.'

"They finally smoothed this out to a euphamism called the responsiveness program, by which they proposed to make the departmental people in the executive branch of government responsive to the President's needs to be re-elected. And as you'll all recall, Mitchell became the chairman of the committee that became notoriously known as CREEP, the Committee to Re-elect the President.

"He had been the Attorney General. Maurice Stans had been the Secretary of Commerce and became the Chairman of the Finance Committee to Re-elect the

President. . .

". . .

"In February, 1972, . . . Maurice Stans at a business counsel meeting in Washington meets Russell DeYoung. Who is he? Russell DeYoung is the Board Chairman of the Goodyear Tire & Rubber Company, and he asks Russell DeYoung if he can come and see him. The testimony will be DeYoung responds, 'You don't need to come and see me, I'll send a man to see you.' And he does.

"The man he sends is the man that's in charge of the slush fund, Mr. Arden Firestone.

"DeYoung and Firestone agree that they're going to contribute $20,000 to the request of Stans, and they hand-carry in cash $20,000 by way of courier, Firestone to the Office of the Finance Committee to Re-elect the President.

". . .

"When Firestone carries the money in the bag wrapped in brown paper, it is testified, to 1701 Pennsylvania Avenue and delivers it to the Committee to Re-Elect the President, Stans advises him that he is disappointed, it is not enough, and sends him back to Akron for more. Firestone consults with Russell DeYoung and they agree between themselves they will add another $20,000 to the ante. And then DeYoung decides that he will add $3,000 of his own, and a check from his wife for two more. A total of $45,000. The other twenty comes out of a safe, and now they are up at $45,000. Firestone returns to Washington with the cash, delivers it to Stans, and it is accepted without comment.

"Now, it develops that the Finance Committee to Re-elect the President is made up of, among other people, of Maurice Stans, of course, and a budget committee serving with him, and Magruder, and on the political committee is Fred Malek. . .

". . .

" . . . In January 1972, following the Nixon re-election, the president of the Union Oil Company, Claude Griniger,

-11-

G-R-I-N-I-G-E-R, I believe, became the Secretary of Transprotation. His righthand man, Dr. James Gregory, became the Administrator of the National Highway Traffic Safety Administration. The other Secretary of Transportation, and the evidence will be that Mr. Malek proposed that we work through the undersecretary, he's our man--the Undersecretary of Transportation, Egil Krogh. He--strange name, E-G-I-L K-R-O-G-H, but pronounced like the bird. Egil Krogh had been in the Nixon White House Staff. He had been the man who organized the White House security force that became known as the plumbers.

"Egil Krogh acted under Secretary of Transportation through the spring of 1973, before the plumbers and the grand juries finally got to him.

". . .

". . . In April 1973, fact, Common Cause, a consumer public interest group, following the burglary and the aftermath of the Watergate, files a lawsuit in the United States District Court for the District of Columbia against the Committee to Re-elect the President.

"In April, they're asking for records of the contributors to the Finance Committee to Re-elect before the April 7, 1973 deadline. . .

". . .

"Firestone advises him, we'll have to get back to Stans. He talked to DeYoung. Stans and DeYoung conclude that they'll give them some phoney names. Stans and DeYoung met with the executives of Goodyear, that included Mr. Pilliod, Mr. Lane, who is their public relations man, and others. They explained the situation, and those gentlemen agree that their names can be misrepresented as the contributors, when they didn't give a cent of money.

". . .

"Well, by July, Common Cause, it now appears to the lawyer for the Finance Committee to Re-elect, that the judge is going to make him reveal the records of who it was that gave this pre-April 7th money. Now, the only evidence, the only

-12-

record of it, because they destroyed all the evidence, was a list prepared at F. CREEP, and sent down the street a block to 1600 Pennsylvania Avenue, addressed to Rosemary Wood, the personal secretary to Richard Nixon. That became know as Rosemary Smith, and Rosemary's list was the only record of the contributors prior to April 7th, coding, cash or whatever. Goodyear employees appear on Rosemary's list, which will be in evidence.

". . .

"Mr. Meyers and Mr. DeYoung and Mr. Firestone consult with outside counsel, and they decide the jig's up, so they go to the Watergate special prosecutor, who you recall is Archibald Cox at the time, to his staff, and they tell their story.

"Archibald Cox charges Goodyear with violation of the federal election law, felony offense, or it could be a felony offense, and also charges Russell DeYoung with that same crime. . .

"On April 19, 1973, Russell DeYoung pleads guilty to violating the federal election law by giving the corporate contribution, and the Goodyear Tire & Rubber Company pleads guilty to the same charge, or substantially the same. Those guilty pleas are a matter of record and they'll be before you.

"Mr. DeYoung is subpoenaed to appear before the Irvin [sic] Committee, that's the Committee of the Senate, Senate Select Committee on Presidential Campaign Activities. It's chaired by Sam Irvin [sic] from North Carolina. He appears on November 15, 1973, and before the Irvin [sic] Committee and a television audience of 50 million, possibly including some of yourselves. He testifies under oath about the scenario of these payments."

No statement was made by plaintiff's counsel in the opening statement to connect all of the foregoing to the Department of Transportation, the wheel investigation and this case. Goodyear moved for a mistrial at the conclusion of plaintiff's opening statement, on the basis that the plaintiff had failed to state sufficient facts to show any

-13-

relationship to the actions of the Department of Transportation and its investigation of the K-type wheel. Counsel also argued that the plaintiff had not stated sufficient facts to show a basis for an award of punitive damages based on the political contribution issue. The District Court considered the objections and denied the motion stating in part:

> "THE COURT: Okay. Well I don't need any further agrument, gentlemen. There isn't any question about it that references to Watergate and the participants in this thing is prejudicial. I agree with that, John [Goodyear's counsel]. There's just simply no question about that. Whether or not we can overcome that by admonitions and instructions to the jury from here on out remains to be seen.
>
> "The difficulty I have with the motion for a mistrial is that granting that would prevent the plaintiffs from putting on their case, and they've got a right to their theory of the case.
>
> "And accordingly, predicated upon that fact alone, the motion for a mistrial is denied. The same is denied, however, without prejudice to resubmit that motion or any other relevant motion having to do with the prejudice or the removal of this particular issues from the case. Alright?"

From opening, through plaintiff's case-in-chief, to closing, plaintiff presented his theory of the Goodyear political contribution to the Nixon Administration in an unsuccessful attempt to tie the activities of the Nixon Administration to the investigation of the K-type wheels. In addition to the motion for mistrial at the conclusion of the opening statement, Goodyear moved for mistrial at the close of plaintiff's evidence and again at the close of all evidence. All motions were denied.

The record shows that Goodyear admitted that it had

plead guilty to making a contribution to CREEP, that those contributions were in violation of Title 18, U.S.C., Section 601, a misdemeanor, and Goodyear paid fines of $5,000 and $1,000.

Throughout the trial, plaintiff attempted to link the Goodyear contribution to an attempted avoidance of the recall of the K-type wheels. Testimony before the Senate Ervin Committee was shown to the jury, with emphasis on the efforts of Mr. Malek, a member of the Committee to Re-elect the President. Malek, who testified before the Ervin Committee, denied knowing of any situations in which proceedings before any department or agency were interfered with, influenced or obstructed.

Plaintiff's theory in offering evidence of the Goodyear contribution to the jury was to suggest that the contribution was made in order to prevent the K-type wheels from being recalled. It should be noted that it was not until 1974, after the investigation had been closed, that NHTSA (the National Highway Transportation & Safety Administration) was empowered to order any recall. In addition, even after the 1974 statutory change which allowed recall, NHTSA could order recalls only in situations where there had been a finding of safety-related defects. Up to the time of trial, there was never a finding by NHTSA that the Goodyear rims had a safety-related defect.

Our careful review of the very extensive record, shows a total absence of evidence connecting the political contribution of Goodyear to the investigation by a federal agency of multi-piece rims of the type which injured the plaintiff. As a result, it is clear that the evidence of

-15-

Goodyear's contribution to the Committee to Re-elect the President was inadmissible under Rule 402, Mont.R.Evid.

In allowing the injection of the Goodyear political contribution, its criminal conduct in making that contribution, the Watergate scandal, and the references to the criminal participants in that scandal, the trial court allowed a relatively simple products liability case to become a political circus and denied the parties the right to a fair trial. We note that the jury split 8-4 on liability indicating it was rather close on the products liability questions. However, the vote for punitive damages was 12-0. This suggests improper influence of the jury on the punitive damage question.

In failing to exclude the prejudicial statements and prejudicial evidence, the trial court permitted the jury to indulge in improper speculation and guesswork contrary to our holding in Graham v. Rolandson (1967), 150 Mont. 270, 435 P.2d 263.

It has long been the law in Montana, that to sustain a recovery the evidence relied upon, whether direct or indirect, must be substantial--more than a mere scintilla. Escallier v. Great Northern Ry. Co. (1912), 46 Mont. 238, 127 P. 458; McIntyre v. Northern Pac. Ry. Co. (1920), 58 Mont. 256, 191 P. 1065. A verdict cannot rest upon conjecture, however shrewd, nor upon suspicion, however well grounded. Olson v. Montana Ore Purchasing Company (1907), 35 Mont. 400, 89 P. 731. In Monforton v. Northern Pac.Ry.Co. (1960), 138 Mont. 191, 211, 355 P.2d 501, 511, this Court held:

> "The record presents no evidence whatever
> that appellee's attention was distracted

-16-

> by the Cloyd car or that Monforton,
> because of any distraction, failed to
> make the necessary look-out for the
> train. To find otherwise involves an
> assumption or inference based upon
> speculation or conjecture that the Cloyd
> car did distract his attention and the
> second assumption or inference based on
> the first, that this distraction was the
> cause of the failure of Monforton to
> discover the train's approach. But under
> section 93-1301-1 to 4, and Fisher v.
> Butte Electric Ry., 72 Mont. 594, 235 P.
> 330, one inference cannot be drawn from
> any other inference or presumption."

See also Graham v. Rolandson, supra; Hageman v. Tourance (1965), 144 Mont. 510, 398 P.2d 612.

In allowing this evidence to be admitted the jury was allowed to speculate concerning the government's investigation into the K-type wheels, known as the IR-215 investigation, despite the fact that Goodyear voluntarily discontinued the manufacture of the K-type wheels three years earlier and despite the fact that NHTSA had no power to order any of those rims to be recalled. It allowed the jury to speculate about on the Malek memorandum, and to surmise, with no evidentiary support, that Goodyear believed that there was a commitment by the White House prior to making its contribution. It allowed the jury to conclude, with no evidentiary basis, that unknown persons in the White House knew of Goodyear's preferences and were in a position to order them to be carried out. It allowed the jury to think, despite all the evidence to the contrary, that Andrew Detrick was moved to the head the Office Defects Investigation, the ODI, by the Secretaty of the Department of Transportation at the direction of unknown White House employees. Finally it allowed the jury to assume, with no evidence to support the assumption that Detrick closed the

IR-215 investigation in 1972 differently than those closed by his predecessor. We find no evidence to support these conclusions, much less proof that these inferences and conclusions are reasonable or even probable. The evidence of Goodyear's contribution should not have been submitted to the jury under Rule 402, Mont.R.Evid.

Unquestionably, the plaintiff's allegations of political bribery were prejudicial to the appellant Goodyear. Circumstances pertaining to the Watergate investigation and subsequent name dropping of the notorious parties had no connection with the cause of action. As previously noted, the trial court observed, "advice of . . . mentioning Watergate and all the rest of it is inherently prejudicial." The court also noted that the prejudice of putting such evidence before the jury outweighed its probative value.

As we review the order of the District Court in the present case, we conclude that it is possible that the trial judge misunderstood our holding in Kuiper v. The Dist. Court of the Eighth Judicial Dist. (Mont. 1981), 632 P.2d 694, 38 St.Rep. 1288. In that holding, we allowed the plaintiff considerable latitude in discovery including, taking the depositions of Goodyear executives and requesting production of documents. However, our holding in that case did not in any manner reduce the duty of the District Court to pass upon the admissibility and relevancy of information produced in the course of discovery.

Last we consider as a part of issue 1 the admissibility of the DeYoung videotape. On retrial this tape should not be played to the jury. It fails to show

anything directly connected with the K-type wheel investigation or the accident which is the subject of this action. See Montana Rules of Evidence 402 and 403; 31 C.J.S. Evidence, Section 108.

After a careful review of the extensive record including the transcript, we conclude that the District Court erred in admitting irrelevant and prejudicial evidence of the Goodyear political campaign contribution and all of the evidence relating to Watergate. In reaching that conclusion, we do not in any way condone the surreptitious contribution of $40,000 by Goodyear to the Committee to Re-elect the President. That was grossly improper conduct. Similarly, we do not in any way approve or condone Watergate, including the participants and their actions, which were so graphically described to the jury. That is a national scandal of which none of us are proud. The key element is that plaintiff completely failed to connect the political contribution of Goodyear to the federal investigation of the multi-piece wheels. The plaintiff failed to prove that the contribution was related in any manner to the multi-piece wheel, which exploded and caused the injury to the plaintiff. We agree with the District Court's conclusion that this evidence was extremely damaging and obviously inflamatory in nature and should have been admitted only upon proof showing its relevance to the present action. The record discloses a total failure to establish such relevance. The possibility of prejudice is clearly present upon the examination of the very substantial punitive damages. We regret that counsel deemed it necessary to bring in this totally extraneous and

prejudicial material. It prevented his seriously-injured client, as well as the defendant, from receiving a fair trial.

The second issue to be considered is whether the trial court erred in admitting irrelevant and prejudicial evidence of other accidents. This issue is subdivided into sub-paragraphs. We will direct our attention to those sub-paragraphs covering material that should not be considered on retrial. In Runkle v. The Burlington Northern (Mont. 1981), 613 P.2d 982, 37 St.Rep. 995, this Court set forth the test for determining the relevancy of "other accidents" evidence. The admissibility test for such evidence is to whether the circumstances surrounding the product involved in other accidents were substantially the same or similar to the accident at issue. This rule should be the guide for the trial court on retrial. A concerted effort should be made by that court to allow the admission of evidence of only those accidents where both the product and the circumstances surrounding the accident were similar to the case at bar. In a products liability case tried in the federal court, Rexrode v. American Laundry Press Co. (10th Cir. 1982), 674 F.2d 826 at 829, the court held that substantial similarity is required in order to "prevent the jury from being misled," and the court further held that the party offering the "other accidents" bears the burden of showing such similarity.

With these rules, the trial court can on retrial carefully protect the record of admissions of the respondents here.

Issue No. 5 is directed to whether the court committed

error in denying a new trial for the alleged misconduct of the bailiff. This issue is discussed principally because this case is being remanded for retrial. While the fact situation involved herein might not necessitate a reversal on this issue alone due to the fact that the defendant's counsel learned of this misconduct while the jury was still out and failed to bring the matter immediately to the attention of the trial court, it is of such import that we urge the trial judge to instruct the bailiffs of the court to follow the statute as to their duties and not communicate with the jurors during their discussions.

The petition for a new trial alleging the misconduct of the bailiff was made under MCA, 25-11-102, which provides:

> "Grounds for new trial. The former verdict or other decision may be vacated and a new trial granted on the application of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:
>
> "(1) irregularity in the proceedings of the court, jury, or adverse party or any order of the court or abuse of discretion by which either party was prevented from having a fair trial;"

Here the affidavit of counsel for the defendant Goodyear stated that, (1) the bailiff told the jurors not to "get hung up" on the instructions in deciding the case; and, (2) during the deliberations while several jurors were trying to apply the instructions, those jurors were reminded by another juror of what the bailiff had said about not "getting hung up" on the instructions; and, (3) the bailiff, upon being informed by a juror that there were "four hard-nosed women in there you can't get anything done with,"

responded, "well, can't you work around them?" and, (4) when a juror gave the bailiff a written question about an instruction, the bailiff stated that the question was "self-explanatory." Such conduct by a bailiff cannot be tolerated.

The appellant next argues the question of instructions given, and whether the court erred in submitting instructions 13, 27 and 41 to the jury, and that these instructions did not include "without substantial change and condition" as an essential element of the plaintiff's proof.

This Court entered into the age of product liability in 1973 with its opinion in Brandenburger v. Toyota Motor Sales, U.S.A.. Inc. (1973), 162 Mont. 506, 513 P.2d 268. In that opinion, we adopted Section 402A of the Restatement of Torts (2nd Ed.), as the applicable law in Montana for strict product liability cases.

That opinion was further developed in a case of this Court that came down five years later, Brown v. North American Manufacturing Company (1978), 176 Mont. 98, 576 P.2d 711. Many of the arguments of defense counsel in this case were made in Brown. This is particularly true as to the argument of appellants that the danger was "open and obvious" and that the product was not "defective" or "unreasonably dangerous" if the danger, occasioned by the use, is open and obvious to the user.

As we noted in Brown, supra, the appellant advanced the "open and obvious danger," or "patent-latent" rule as a bar to the plaintiff's recovery under the theory of strict liability. There we rejected such rule noting also that it had been rejected by many other jurisdictions.

We held in <u>Brown</u>, that the "open and obvious danger" rule is not contained in 2 Restatement of Torts (2nd Ed.) Section 401A, nor in the comments thereto. The source of that rule was a New York case, Campo v. Scofield (1950), 301 N.Y. 468, 95 N.E.2d 802. However, that rule was abandoned by the New York Court of Appeals in a later case, Micallef v. Miehle Co., Division of Miehle-Goss Dexter, Inc. (1976), 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571.

In <u>Brown</u>, following the better reasoned cases, we held that such a rule would operate to encourage misdesign. The fact that it was a patent danger does not prevent a finding that the product is in a defective condition or unreasonably dangerous to the particular plaintiff. Rather, the obvious character of the defect or danger is but a factor to be considered in determining whether the plaintiff in fact assumed the risk. We held in <u>Brown</u>, supra, that, "a showing of proximate cause is a necessary predicate to plaintiff's recovery in strict liability." Strict liability is, of course not "complete liability without fault." There is no absolute immunity. Plaintiff's behavior may result in a break in the chain of causation and operate to bar recovery as discribed in 2 Restatement of Torts (2d Ed.), Section 402A, comment (n).

We further hold that the above standard of conduct, set forth in Section 402A, comment (n), of plaintiff as related to the injury must be considered on the assumption of risk when applied to strict liability cases. We further hold that in considering assumption of risk in strict liability cases, the actions of the plaintiff are to be judged by applying a subjective standard to plaintiff's

conduct rather than the objective standard of a reasonable man.

The evidence produced in this case, including the appellant Goodyear's records and records from federal government investigation of the rim design, indicates that there were numerous accidents experienced over a considerable period of time involving the K-type rim. Testimony from both the Goodyear engineers and plaintiff's experts, as well as Goodyear's field surveys and their conclusions, indicates that the K-type rim was an inherently and unreasonably dangerous design, and that for some years Goodyear had knowledge of that fact. Part of the testimony of Goodyear's expert, a field engineer, R.M. Smith, showed that the parts of the rim were "inherently dangerous both on the highway and in the shop. When in use, the dangerous condition is often masked." In this case, the appellant does not raise the question of sufficiency of the evidence of design defect. There was no issue presented in the case of intervening alteration in the design of the product. Goodyear's design engineer, Gerhart Gerbeth, testified that he could find no evidence of any indication that anyone had changed Goodyear's design of either the rim or the ring, either or both of which could have contributed to the explosion that injured the plaintiff.

Appellant Goodyear contends that instruction no. 13 is erroneous in omitting the language requiring that the "product reached Dennis Kuiper without substantial change in the condition in which it was sold." However, appellant in this instruction did not submit the defective condition of the product, but rather that the product was defectively

designed.

Appellant objects to instruction no. 13 which states:

> "You are instructed that in order to recover on the allegation of design defect, the plaintiff must prove:
>
> "First, that the defendant designed and manufactured the K-type rim base and ring which at the time of manufacture was defective in design and unreasonably dangerous to the user.
>
> "Second, that at the time of the accident the K-type rim base and ring were being used by Dennis Kuiper in a manner reasonably anticipated by the defendant.
>
> "Third, that the defective design in the K-type rim base and ring proximately caused injury to the plaintiff."

Appellant argues that the instruction omits the requirement that the product be shown to be in substantially the same condition at the time of injury as it was at the time it left the manufacturer's hands.

The correct law governing plaintiff's proof in a design case is found in Brown, 176 Mont. at 105, 106, 576 P.2d at 716, we stated:

> "[1] In order to establish a prima facie case in strict liability based upon the above definition, a plaintiff must prove the following elements:
>
> (1) The product was in a defective condition 'unreasonably' dangerous to the user or consumer;
>
> (2) The defect caused the accident and the injuries complained of; and
>
> (3) The defect is traceable to the defendant."

Court's instruction no. 13 requires the jury to find that the product was defective in design at the time of manufacturing. This satisfies the three-prong test for a prima facie case in strict liability, which is the third

-25-

element of the plaintiff's case set forth in <u>Brown</u>, supra. We find that all of the elements of the design defect case are set forth in <u>Brown</u> and are incorporated in the instruction no. 13.

At this point we note that the respondent cites as authority in its brief, Kuiper v. District Court of the Eighth Judicial Dist., supra, for the proposition that said case sets forth the elements of strict liability for defective design and failure to warn. The respondent further bases much of his argument on a citation allegedly made in <u>Kuiper</u> to that effect. We note that the action in <u>Kuiper</u> was one of supervisory control directed to the discovery of certain documents and compelling answer thereto.

In rejecting Goodyear's argument denying his motion for new trial, the trial court very carefully considered the objections to the above two instructions and set forth his reasons for denying the same. We concur in the trial judge's holding and find no error. The trial judge noted in denying the motion for new trial that,

> "There is no requirement that a design remain in substantially the same condition since obviously the design of the product does not change from the date of its original manufacture, absent some modification in design which was not an issue in this case.

> "This issue is considered at length during the instruction conference between the court of counsel and it is the court's concerted opinion that in a [product liability] design case, the changes in the product through wear, tear, or even abuse do not affect the question of whether the original design was defective and unreasonably dangerous. Design is judged not by the condition of

-26-

the product, but the state of scientific
and technical knowledge availabe to the
designer at the time the product was
place on the market."

Goodyear acknowledged this proposition in its offered

instuction 27(a), which was court's instuction no. 14.

"If the design was defective and that
defect proximately caused the accident,
any design changes and condition of the
rim during the prior uses are irrelevant
and would not preclude the plaintiff's
recovery for design defect. * * *"

The Court notes that Goodyear's proposed instruction

25(a), given as court's instruction no. 24, uses the word

"anticipate" and resolves any possible confusion or

misdirection regarding substantial change by requiring a

finding in favor of Goodyear. If the jury determined the

product was not defective and unreasonably dangerous when it

left Goodyear's control, but was made dangerous by

subsequent alteration, change, improper maintenance, abuse,

or abnormal use, which the manufacturer could not reasonably

anticipate, there would be no liability. These instructions

were read together, and in light of the evidence of the case

make it clear that Goodyear could not be held liable for

defects in the product occurring after it left Goodyear's

control, as opposed to design defect. Both instructions are

correct statements of the law.

Obviously, the trial judge here instructed the jury to

the effect of subsequent alteration or change, but they were

cautioned that the law does not presume that the product was

in defective condition at the time it left the hands of the

manufacturer. Instruction no. 20, stated that the lapse of

time from the date of the manufacture to the date of the

accident, was a factor to be considered; instruction no. 22,

that the manufacturer is not required to produce or sell a product that will never wear out; instruction no. 23, that in order to recover, the plaintiff had to prove that the rim base and ring were being used in a manner reasonably anticipated by Goodyear; instruction no. 13, that the jury must find that the product was defective in design at the time of manufacturing in order for plaintiff to recover.

Not only were these instructions proper statements of the law in product liability in Montana, but they were properly given in this case. We find no error.

We have held in strict liability cases, such as Brandenburger, and Brown, that:

> "On whatever theory, the justification for strict liability has been said to be that the seller, by marketing his product for the use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has a right and does expect, in a case of products which it needs and for which it is forced to rely on the seller, that reputable sellers will stand behind their goods; that the public policy demands that the burden of accidental injuries caused by products intended for consumption to be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who placed the product in the market."

Restatement of Torts (2d Ed.), Section 402A, comment (c), p. 349, 550.

Recognizing that the seller is in the best position to insure product safety, the law of strict liability imposes on the seller a duty to prevent the release of "any product" in the defective condition unreasonably dangerous to the

-28-

user or the consumer, "into the stream of commerce." See Restatement of Torts (2d Ed.), Section 401(a)(65). This duty is unknown in the law of negligence and it is not fulfilled even if the seller takes all reasonable measures to make his product safe. The liability issue focuses on whether the product was defective and unreasonably dangerous, not only upon the conduct of the user or the seller. Put in this light, the only duty imposed on the user is to act reasonably with respect to the product which he knows to be defective and dangerous. It is only when the user unreasonably proceeds to use a product which he knows to be defective and dangerous, that he violates this duty and relinquishes the protection of the law.

In summary, assumption of risk is an available defense in a strict liability case. The defense must establish that plaintiff voluntarily and unreasonably exposed himself to a known danger. If the defense is found to exist then plaintiff's conduct must be compared with that of defendant. The same Montana law which governs comparison of contributory negligence controls comparison of assumption of risk.

The policies of negligence and warranty liability will best be served by keeping the spheres in which they operate separate until such time as the legislature indicates how and by what extent they are to be changed. The standards of care and the duties are well-defined in each sphere.

We have carefully examined the many issues raised on this appeal, and except to the issues here addressed, we find further discussion of these issues unnecessary. However, under the facts and circumstances herein recounted,

it can only be said that the irrelevant political evidence affected this jury. It takes no fanciful flight to perceive the strong probability of prejudice to the defendant preparing to defend a product liability cause.

It is understandable for persons witnessing the enormity of the misconduct of the officials of Goodyear Tire & Rubber Company, in its efforts to re-elect Richard Nixon to hold their feet to the fire and make them pay for their misdeeds. That is not the problem this Court had to face in deciding this case.

The first Justice Harlen speaking for the court in the case of Vicksburg and Meridan Railroad Co. v. O'Brien (1886), 119 U.S. 99, 103, 7 S.Ct. 172, 174, 30 L.Ed. 299, 300, stated:

> "While this court will not disturb a judgment for an error that did not operate to the substantial injury of the party against whom it was committed, it is well-settled that a reversal will be directed unless it appears beyond a doubt that the error complained of did not and could not have prejudiced the rights of the party."

See also, Goff v. Kinzle (1966), 148 Mont. 61, 417 P.2d 105.

This cause is remanded for a new trial.

_____
Justice

We concur:

_____
Chief Justice

_____

Justices

Mr. Justice L.C. Gulbrandson specially concurring.

I concur with the result expressed in Mr. Justice John Conway Harrison's Opinion, but not with the comments expressed therein which reaffirm an abandonment of the defense of assumption of risk enunciated in 2 Restatement of Torts (2d Ed.), Section 402A, comment (n).

_____
Justice

Mr. Justice Frank B. Morrison, Jr. dissents as follows.

I very vigorously dissent from that aspect of the majority opinion relating to Goodyear's political activities. The serious departure from evidentiary standards found in the majority position results from an emotional reaction to "Watergate". From time to time the judicial vision of even appellate judges becomes clouded. Sadly, this is one of those times.

Let us forget about political partisanship. Let us not debate the morality of the Nixon administration. This is a court of law. Well recognized evidentiary principles exist and properly applied, they control the resolution of this issue.

The applicable legal principles are:

1. In civil actions, a trial court has wide discretion in admitting circumstantial evidence and its ruling will not be disturbed on appeal absent a showing of abuse of discretion. Unified School District #490, Buttler County v. Celotex Corp. (1981), 6 Kan. App.2d 346, 629 P.2d 196; Barmeyer v. Montana Power Co. (1983), 657 P.2d 594, 40 St.Rep. 23.

2. Circumstantial evidence sufficient to prove a fact in a civil cause need not exclude every reasonable conclusion other than the conclusion sought to be established. Plaintiff's evidence is sufficient if it affords a basis for a reasonable inference by the trier of fact although there are other reasonable inferences which might be drawn by that trier of fact. Jacques v. Montana National Guard (1982), 649 P.2d 1319, 39 St.Rep. 1565.

3. Fraudulent, dishonest and dishonorable conduct cannot often be proven by direct evidence. Therefore, the courts grant great latitude to the one having the burden of proof. Facts which throw suspicion on a transaction or course of dealing are admissible even though a certain amount of speculation is necessarily involved when drawing inferences from those facts. Montana National Bank v. Michels (1981), 631 P.2d 1260, 38 St.Rep. 334; Merchants National Bank v. Greenhood (1895), 16 Mont. 395, 41 P. 250.

The evidence which the majority found to be improperly admitted, and which will be excluded from the future trial, can be summarized as follows:

In April of 1970, the National Highway Traffic Safety Administration had instituted an investigation of K-rims. The stated purpose of the investigation was to determine whether the problem represented a safety defect within the meaning of the National Traffic and Motor Vehicle Safety Act of 1966 (tr. 1894). The investigation was known as OBI-215. The investigation was officially closed on December 31, 1973, without a consumer notification or recall campaign (plaintiff's exhibit 37, tr. 1893 and 1899).

There is no question that Goodyear was seriously concerned about the investigation and the potential of having to notify consumers that K-rims were dangerously defective. There were 2,900,000 K-type rims in service in 1972-73 (tr. 3181). Joseph Hutchison, the head of safety for Goodyear, estimated the cost of replacing K-rims at $50 apiece (tr. 1712). The cost of a recall would reach the magnitude of $145,000,000. Hutchison, the head of safety, characterized the investigation of K-rims as an "overwhelming problem" (plaintiff's exhibit 72). A Goodyear engineer researching the problem, was told by the Department of Transportation that the investigation had "top priority" (tr. 3735-36).

The person who, prior to March of 1972, had headed the office of defects investigation for NHTSA was one Joseph Clark. In February and March of 1972, Goodyear executives had negotiated a cash contribution to the Committee for Re-election of the President. Initially, Goodyear offered $20,000. Maurice Stands rejected this offer and said that he hoped for $50,000. Thereafter, a Goodyear vice president named Arden Firestone carried cash and checks totaling

33

approximately $45,000 to the Committee to Re-elect. This was done March 14, 1972. Three days later, on March 17, 1972, Carter was removed from his position and transferred to Ohio. He was replaced by Andrew Detrick, who was placed in charge of the office of defects investigation though he had no background in that kind of work.

In early August, 1972, Joseph Hutchison met in Washington with Andrew Detrick to lobby him regarding the K-rim investigation. After Hutchison's first meeting with Detrick, he wrote a letter summarizing his meeting as follows:

> "Detrick stated that he feels a safety problem exists on these multi-piece truck rims, and that he would like to handle this problem before it gets any more publicity."

In the months that followed, Goodyear executives lobbied Detrick against requiring a manufacturers' notification campaign. Investigation 215 was officially closed on December 31, 1973, without requiring consumer notification. The closing of investigation 215 resulted from a recommendation by Andrew Detrick. Detrick briefed the administrator of the National Highway Traffic Safety Administration and the job was accomplished.

The facts here are very simple. The decision to move Detrick in as head of product defects investigation was made by the Nixon administration. It was a political decision pure and simple. The move occurred several days after a $45,000 contribution was made to the campaign. To say that this evidence cannot be considered by a jury because, as a matter of law, there is no connection between the contribution and the personnel change, is to totally fail in recognizing the realities of the political process.

All of the activities of Goodyear in attempting to influence government action are admissible for one or more of the following reasons:

(1) The evidence shows that Goodyear had knowledge of the defect.

(2) The evidence shows that Goodyear was not taking steps to notify the public of the known defect, but in fact was attempting to scuttle any notification.

(3) The evidence tends to prove fraud, malice, or oppression, which form the basis for an award of punitive damages.

In Kuiper v. District Court (1981), 632 P.2d 694, 38 St.Rep. 1288, we said:

> "That investigation was commenced in 1970 for the purpose of determining why K-type truck rims seemed to cause numerous accidents. The relator seeks to establish that Goodyear attempted, through government influence, to terminate the investigation. The relator alleges that Goodyear 'covered up' the defect in a product, which Goodyear knew to be unsafe, and that the relator is entitled to prove such facts to establish a basis for punitive damages." 632 P.2d at p. 696, 38 St.Rep. at p. 1289.

And,

> "Relator's deposition questions are designed to prove Goodyear knew it had a defective product and attempted to prevent public knowledge of that defect. Such facts would tend to prove malice and are relevant to the issues pleaded." (emphasis added) 632 P.2d at p. 703, 38 St.Rep. at p. 1298.

Likewise, the District Court held this evidence to be admissible and in the order denying Goodyear's motion for a new trial, on pages 15 and 16 of the order, said:

> "In these circumstances Goodyear's motions in limine must be denied in that the facts established a submissible jury issue on the basis that the slush fund payments were evidence of an attempt to abort the spirited investigation at the NHTSA as proof of defect in the product. In the Matter of the National Deposition of James D. Rhoades (sic), Archivist of the United States, Miscellaneous No. 79-0216, United States District Court for the District of Columbia, October 1, 1980. Such

evidence was also admissible on the issue of malice. Kuiper v. District Court, ____ Mont. ____, 632 P.2d 694 (Mont. 1981)."

Dishonest conduct can seldom be proven with direct evidence. The difficulties of the task are eloquently described by Justice De Witt in Merchants' National Bank v. Greenhood, supra, wherein he said:

"Fraud cannot often be proven by direct evidence. Fraud conceals itself. It does not move upon the surface in straight lines. It goes in devious ways. We may with difficulty know 'whence it cometh and whither it goeth.' It 'loves darkness rather than light, because its deeds are evil.' It is rarely that we can lay our hand upon it in its going. We are more likely to discover it at its destination, before we know that it has started upon its sinuous course. When we so discover it, the search light of a judicial investigation goes back over its trail and lightens it from beginning to end. As the woodsman follows his game by slight indications, as a broken twig or a displaced pebble, so fraud may become apparent by innumerable circumstances, individually trivial . . . but in their mass 'confirmation strong as proofs of holy writ.' The weight of isolated items tending to show fraud may be 'as light as the shadow of drifting snow,' but the drifting snow in time makes the drift, the avalanche, the glacier. Fraud may hang over the history of the acts of a man like the leaden-hued atmosphere upon the house of Usher, 'faintly discernible but pestilent, an atmosphere which has no affinity with the air of Heaven.'" 16 Mont. at p. 429, 41 P. at p. 259.

Justice De Witt, in concluding remarks, stated the scope of judicial review which should have guided the deliberations of this Court.

"Under this atmospheric pressure of fraud the jury in this case lived and breathed for the 21 days of the trial. We have followed them through the history of those days, as it is transmitted to this court in the record. We have not the advantage of breathing and seeing and hearing which they had. The district court had that advantage, and agreed with the findings of the jury. We are of opinion that, under these circumstances, the evidence is not so insufficient that we should disturb the result." 16 Mont. at pp. 429-430, 41 P. at p. 259.

The majority places emphasis upon the fact that the trial court found that evidence of Goodyear's attempts to suppress knowledge of the dangerous propensities of its

split-rim and its efforts to scuttle the investigation would be prejudicial to the defendant. Of course such evidence would be prejudicial. The purpose of offering the evidence is to expose the fraud and punish the defendant. The question is not just whether the evidence is prejudicial, but rather whether our rules of evidence permit consideration of the evidence. The evidence here introduced was not only relevant and probative but was essential to prove a course of conduct that plaintiff seeks to punish.

If I understand the majority opinion correctly, no certain piece of testimony or document is found to be irrelevant, thereby justifying a new trial. Rather, any evidence, either testimonial or documentary, which falls under the umbrella designated "Watergate" is to be suppressed. Like Rosemary's tapes, this evidence of wrongdoing is erased from public scrutiny and forever shielded from jury censor.

The majority states: "We regret that counsel deemed it necessary to bring in this totally extraneous and prejudicial material. It prevented his seriously-injured client, as well as the defendant, from receiving a fair trial." In my judgment trial counsel would have been remiss not to have presented the evidence of bribery. The failure is not counsel's. The fault lies here.

As with most dissents, my cry may neither be heard nor felt. At least my conscience is clear.

Justice

37

Mr. Justice John C. Sheehy, dissenting:

I dissent.

My heart does not bleed with the majority for the captains of industry called Goodyear who were caught in a sticky wicket. Instead, my heart bleeds for a grievously-injured Dennis Kuiper who must return yet again to the courtroom to get just compensation, but this time hobbled in his proof of the malice of these honorable industry captains.

The majority of justices see no relevance in this case in the illegal donation to Nixon's campaign and the almost immediate dismissal by the Nixon administration of its investigation of the safety of the K-28 rims. The majority wants a smoking gun for proof, ignoring the many times in opinions that each has signed that fraud is almost never subject to direct proof, because the evil that men do is done clandestinely, without record, and that circumstantial evidence is necessary to bring out fraud.

Dennis Kuiper was injured on August 13, 1979. For more than ten years prior to that date, Goodyear was aware that its K-28 rim could come apart explosively, and that the rim posed a danger to the life and limb of any person mounting or dismounting tires thereon. Properly, Dennis Kuiper has sued for punitive as well as compensatory damages. Punitive or exemplary damages are allowed when the tortfeasor has been guilty of oppression, fraud or malice, actual or presumed, and are given for the sake of example and by way of punishing the tortfeasor. Section 27-1-221, MCA. Therefore, Goodyear's knowledge that it had a dangerously defective rim, and its efforts to avoid curing that defect or removing the

rim from the market over a period of years is an essential part of Kuiper's proof of malice against Goodyear. The sordid donation by Goodyear to Nixon's campaign was a part of Goodyear's malicious effort to keep its defective product on the market and in use in spite of its knowledge of the defect.

The relevance of the Nixon campaign donation by Goodyear is best summarized by the District Court in this case, in denying Goodyear's motion for new trial:

> ". . . A summary of the plaintiff's evidence includes the undisputed fact that Goodyear for many years prior to the investigation of the K rim maintained an offbook account known only by the code name 'GOYEDA' in a Swiss bank from which funds were drawn and maintained at Goodyear's world headquarters in Akron, Ohio for the purpose of making illegal domestic political contributions. Goodyear's Board Chairman and general counsel participated in cash payments of $40,000 to Maurice Stans, Chairman of the Finance Committee to Reelect the President (FCREEP) in March of 1972 in circumstances which give rise to an inference of attempts to seek political favors. Goodyear became listed on the document known in the Watergate investigation as Rosemary's List, a record of substantial poltical contributors maintained by the personal secretary of Richard Nixon. At the time of these contributions there was pending before the National Highway Traffic Safety Administration (NHTSA) a defects investigation involving the Goodyear K rim which is the subject of this suit as well as a Firestone multi-piece rim and proposed rule making which had the potential for limiting or discontinuing production of most multi-piece truck rims. Contemporaneous with the cash payments by Goodyear to 'FCREEP' key personnel in charge of these proceedings at 'NHTSA' were transferred to other positions and new personnel of questionable qualifications were placed in charge of the proceedings. The defect investigation of the K rim was thereafter discontinued inconsequentially following the Nixon reelection and the appointment of Egil Krogh as Under Secretary of Transportation. In a memorandum of August 15, 1972, Goodyear's safety vice-president report to the president of Motor Wheel Corporation that he had had a conference with the newly selected chief of the Office of Defects Investigations at the 'NHTSA' and was advised that in view of that public official 'a safety problem exists on these multi-piece truck rims, and that he (the public official) would like to handle this problem before it gets any more

publicity.  Then followed a meeting with the public
official several days after the Nixon reelection
and the investigation was closed without requiring
any recall of the product.  Goodyear's subsequent
conduct in attempting to cover up the existence of
the investigation and effect of the corporate
nature of the contributions is additional evidence
that a quid pro quo was intended.  The evidence was
undisputed that following the relevations of the
connection between the Committee to Reelect the
President and the Watergate burglary, the Common
Cause litigation forced the disclosure of identity
of contributors and as a result Maurice Stans
contacted Goodyear general counsel Arden Firestone
requesting the names of the contributors on behalf
of Goodyear.  Instead of disclosing to Stans and to
the United States District Court of the District of
Columbia that the cash contributions to FCREEP were
corporate monies, Firestone met with Russell
DeYoung, Goodyear board chairman, and they agreed
to submit the names of Goodyear executives who
purportedly contributed when in fact they had not
given a single penny.  This continued effort to
cover up through misrepresentation of the identity
of the source of the contribution leads to the
inference that Goodyear sought a quid pro quo in
attempting to avoid public disclosure of the fact.
According to DeYoung's testimony before the Ervin
Committee, the videotape which was in evidence, it
was only the pressure from Archibald Cox, Watergate
Special Prosecutor and the fear of adverse
publicity that caused Goodyear to come forward with
the admission of a corporate contribution.

"Goodyear and its board chairman Russell DeYoung
pleaded guilty to violating the Federal Election
Laws with respect to the contribution.  Following
the convictions of Goodyear and its board chairman,
DeYoung was subpoenaed before the Ervin Committee
on November 15, 1973.  At that time DeYoung swore
under oath before the Senate of the United States
that:  'at the time the contribution was made, the
company was not engaged in any significant
litigation with the government and was not aware of
any material problems it faced with any branch of
the federal government,' and that the illegal
contribution was merely for the good of the
country.  There was no disclosure of the defects
investigation of the Goodyear K multi-piece rim, or
the rule making proceedings involving multi-piece
rims, which were both pending at the time Goodyear
made the illegal payments.  The video-tape of the
proceedings which was offered by the plaintiff and
viewed by the jury not only documented the facts of
the payment and denial of the investigations
pending, but the jury had the opportunity to judge
the demeanor and credibility of the Goodyear board
chairman when asked about the reason for the
payment and his explanation thereof.  Four days
following DeYoung's testimony before the Ervin
Committee and denial of the existence of any

pending national investigations at the time the payments were made, an internal Goodyear memorandum reported that the same government official who told Goodyear's safety vice-president that he wanted to handle the matter without publicity was reported to have advised that Goodyear should 'sit quietly' with respect to closing of the K rim investigation until the government official advised Goodyear what 'its next move should be.' In these circumstances Goodyear's motions in limine must be denied in that the facts established a submissible jury issue on the basis that the slush fund payments were evidence of an attempt to abort the spirited investigation at the NHTSA as proof of defect in the product.. . ."

The District Court's foregoing summary of the evidence with respect to the campaign donation is brief and correct. The expanded record before us, so lengthy that we cannot incorporate it here in full, and so devastatingly connected to the government's K-rim investigation in 1972 is so shocking, that no smoking gun is needed. Undoubtedly, Goodyear was buying its protection through the political donation.

Illustrative of the machinations that were going on between Goodyear and the administration officials is the memorandum by its technical manager for product quality and safety addressed to J. F. Hutchison, vice-president of Goodyear, on November 19, 1973:

"J. F. Hutchison, vice-president.

"Subject: Rim investigation Case -215.

"I have just talked with Andy Detrick [the federal official in charge] this morning relative to the closing of the above case.

"As you know there have been a number of questions raised by Mr. Garbeth as to certain information which we feel should be held out of the closed file.

"Mr. Detrick informs me that they have their legal people working on this and we should sit quiet and wait until we hear from Detrick as to what our next move should be. I should add that there is a question in their own minds as to whether or not the information they gleaned from our files in

Akron will be kept out or not, and this is the one part that their law people are looking into."

The rim investigation was closed by the government in December 1973.

In light of the foregoing record, it is interesting to note the testimony of Russell DeYoung, board chairman of Goodyear before the Ervin Committee on November 15, 1973, when he stated under oath:

".  .  . It [the $40,000 contribution] was made solely because we thought the reelection of the president was in the best interest of the country. It was not made with a view to obtaining government favors. Nor was I pressured in any way into making it. Goodyear's total business with the federal government, most of which is obtained at competitive bidding, constitutes less than 3 percent of its sales. At the time the contribution was made the company was not engaged in any significant litigation with the government and was not aware of any material problems it faced with any branch of the federal government. No Goodyear employee in charge of government business was aware of the contribution, and there is no indication that any government official was made aware of the contribution." (Emphasis added.)

DeYoung's statement that Goodyear was not aware of any material problem it faced with the government is an outright untruth. Its own people estimated that a recall of the rims in use would have cost Goodyear approximately $140 million.

The monstrous extent of the evil that was the Nixon administration is hard for some people to accept. Ten years later, a syndicated columnist finds Nixon merely "unlucky." Often one hears that Nixon only did what others have done, though his actions are an unparalleled trough in our national ethics. It was expressed in our own conference on this case that Goodyear could not have hoped to "buy out" for a mere $46,000. But Nixon and his coterie were not selling to the highest bidder, they were selling to any bidder. FCREEP agent Maurice Stans had set out with a suitcase full of

corporate officials that either wanted to gain government contracts or to avoid adverse regulation. Favorable government consideration, or the hope of it, was the bait. The very nature of Stans' offer should have alerted the offerees. If they contributed before April 7, 1972, there would be "no record" because of a hole in the law then applicable. Stans' undertaking was tailor-made for the gullible, the greedy and the crooked. That he would come together with the Goodyear officials was as natural as the meeting of two moles in the dark.

For truth to tell, the men who ran Goodyear in the early 70's were cheats. They cheated their stockholders by siphoning into a Swiss bank account discounts accruing from European purchases, stealing from company profits by that much. They cheated the I.R.S. by understating company profits, thus increasing taxes for the rest of us. They cheated our election laws and soiled our democracy by illegally coughing up at the command of a corrupt administration the cash they had smuggled into our country. They travelled to Washington, D.C. as bagmen, to hand-deliver the illicit lucre like truckling sycophants. Their lawyers now tell this Court that these cheats made their dark, forbidden contributions of stolen money under cover of unlawful secrecy to achieve "good government." And strange to tell, there are judges who see no dispute for a jury in that. Thieves and brigands, these cheats find a haven in the very institutions they would have torn up by the roots. No whisper of their chicanery in hiding the death-dealing K-rims shall echo in the next District Court. Hidden from the next jury and the fierce light of its scrutiny is the sordid story of venal men who did not give a snap for human safety, for

working men like Dennis Kuiper.  In the sanitized next trial, the Goodyear blimp will float in pristine blue, far above the wiles and schemes of its ground crew.  I know not what other trenchant orders may issue while I sit on this Court, but I pray that someday some grandchild will read and be glad that I had none of this.

There is other manifest error in the majority opinion. It is needless for me to comment on it, as any comment would go unheeded as is this comment.  It is enough to say that I would affirm the judgment of the District Court.


John C. Sheehy
                        Justice

Mr. Justice Daniel J. Shea, dissenting:

By a simple stroke of the pen, and by a failure to fairly analyze the evidence, the majority declares that plaintiff failed to show a connection between the 1972 Goodyear contributions to the Committee to Re-elect the President and the government's decision later that year, after President Nixon had been re-elected, to quietly end the government's multi-piece rim product safety investigation. The majority states (pp. 15-16):

> "Our careful review of the very extensive record, shows a total absence of evidence connecting the political contribution of Goodyear to the investigation by a federal agency of multi-piece rims of the type which injured the plaintiff. As a result, it is clear that the evidence of Goodyear's contribution to the Committee to Re-elect the President was inadmissible under Rule 402, Mont.R.Evid."

This conclusion arrived at by reviewing the testimony of Mr. Malek in isolation, could not be farther from the truth. Justices Morrison and Sheehy have amply set forth the contrary evidence, evidence that fully justified the jury in inferring the necessary facts in a circumstantial case, to award exemplary damages against Goodyear.

It was not merely a coincidence that the National Highway Traffic Safety Administration closed its official investigation on December 31, 1973, less than two months after the re-election of President Nixon, thereby avoiding an expensive consumer notification program or possibly even a government request that Goodyear voluntarily recall its K-rim wheels.

Goodyear was vitally concerned about the investigation and the ramifications of notifying consumers that the K-rim wheels were dangerously defective. The projected cost to

Goodyear was 145 million dollars, and it was characterized as an "overwhelming problem." Goodyear was fully aware that the governmental investigation had top priority--but then the Goodyear people went to work.

In February and March 1972, Goodyear made its contributions to the Committee to Re-elect the President. Three days after these contributions, the person who headed the investigation for the government, Joseph Clark, was removed from his position and transferred to an innocuous position in Ohio. His replacement, Andrew Detrick, had no background in product defects investigation.

After Detrick's appointment and a few months after the contributions (August 1972), a Goodyear representative, Joseph Hutchinson, met with Detrick to discuss the K-rim wheel investigation. This Goodyear agent later summarized this meeting in a memo to his company, by explaining that Detrick indeed felt a safety problem existed (for the wheels still being used by the public) but "that he [Detrick] would like to handle this problem before it gets publicity." By the end of December this task was accomplished.

In the following months after August Goodyear executives succeeded in lobbying Detrick against a governmental requirement that Goodyear notify purchasers of the potential hazards of the K-rim wheels. In late December 1972, after President Nixon was re-elected and while Egil Krogh was Undersecretary of the Department of Transportation, the government quietly announced that the multi-piece wheel investigation was ended.

Goodyear's political contributions took on added meaning because of the revelations during the Watergate episode, and especially revelations before the Ervin Committee

investigating the Watergate Hotel break-in and its ramifications. These developments proved that Goodyear attempted to cover up the source of the corporate contributions to the Committee to Re-elect the President. It was also established that Goodyear attempted to cover up the significance of the contributions by the testimony of its chairman, who testified that when the contributions were made Goodyear was not involved in significant proceedings with the government. But it was revealed that Goodyear had two rather significant proceedings pending with the government, both proceedings involving multi-piece wheel rims--wheel rims like the one that burst apart and grievously injured Dennis Kuiper.

Post-election Watergate investigations developed the connection between the Watergate burglary and the Committee to Re-elect the President--that is, the Committee, directly or indirectly, brought about the Watergate burglary. After these revelations, Goodyear was asked to reveal its contributors, but Goodyear, through Chairman DeYoung and Arden Firestone, decided that instead the corporation would claim that corporate officers had individually given the money rather than the corporation. This evidence was given to the Ervin Committee. This continuing coverup is circumstantial evidence that the jury was entitled to hear as bearing on the motivations of Goodyear in making the contributions to the Committee to Re-elect the President.

Through a videotape of Goodyear Chairman DeYoung's testimony before the Ervin Committee, the jury saw and heard his falsifications. He admitted that it was only pressure from the Special Prosecutor Archibald Cox and fear of adverse publicity that Goodyear was finally persuaded to admit that

the contributions were actually corporation contributions. The Goodyear chairman was asked whether these contributions were motivated by ulterior motives and Chairman DeYoung replied that the contributions were motivated solely "for the good of the country." Yet he testified falsely in stating that when the contributions were made, no governmental action of any consequence was pending. The uncontradicted and undeniable evidence was that two significant government proceedings were pending regarding the multi-rim wheels. First, the government was conducting the multi-rim wheel defect investigation, and the Goodyear company projected a government ordered consumer notification program to cost Goodyear at least 145 million dollars. Second, the government also had pending rulemaking proceedings involving multi-piece wheel rims. Both government proceedings involved the same kind of multi-piece wheel rims that burst apart into Dennis Kuiper's head.

Although the majority would grant a new trial and order that evidence of the government investigation of the multi-piece wheel rims and political contributions of Goodyear be excluded nowhere does the majority discuss the evidence that was admitted at trial. Instead, the majority focuses on the opening statement of plaintiff's counsel and on the testimony of Mr. Malek before the Ervin Committee. As a result of this selective focusing, the majority declares:

> ". . . The key element is that plaintiff completely failed to connect the political contribution of Goodyear to the federal investigation of the multi-piece wheels. The plaintiff failed to prove that the contribution was related in any manner to the multi-piece wheel, which exploded and caused the injury to the plaintiff." (Slip op. at 19.)

I am not sure I understand this conclusion by which the majority declare that plaintiff's proof failed. The

conclusion appears to have two parts, but I do not believe that as to the second part, the majority truly mean what it says. In the first sentence, the majority states that plaintiff did not establish the connection between the political contributions and governmental multi-piece wheel investigation. If this is the key conclusion, it could only have been reached by ignoring the evidence set forth by Justices Morrison and Sheehy in their dissents. But if in the second sentence the majority is stating that plaintiff had a duty to prove the contributions were made to influence governmental action on the particular wheel rim that injured plaintiff, the majority has placed an impossible burden on all plaintiffs, for that kind of proof is impossible. I do not, however, believe that the majority would impose such a requirement, although by the language used, it appears that it has.

Assuming that the majority holding is confined to the conclusion that plaintiff did not prove the connection between the political contributions and multi-piece wheel rim investigation, how does the majority reach this conclusion? Reliance is placed on the opening statement of plaintiff's counsel which failed, in the eyes of the majority, to make this connection, and on the testimony of Mr. Malek, a member of the Committee to Re-elect the President, who testified he knew of no connection between the contributions and any attempt by Goodyear to influence government action on any matter.

The majority opinion confuses me. The opinion devotes several pages to quoting parts of the opening statement of plaintiff's counsel as it relates to the political contributions and the government investigation of the

multi-piece wheels. The majority also says the opening statement was defective because it did not set forth the connection between Goodyear's contributions and the government's investigation of the wheels manufactured by Goodyear. The majority then appears to say that because the opening statement was defective, it ipso facto prejudiced the trial. And yet the majority does not appear to grant a new trial because of its declaration that the opening statement was defective. Rather, the majority grants a new trial, and orders evidence excluded at the new trial, because the trial evidence did not establish the connection between the Goodyear contributions and the government investigation of Goodyear's multi-piece wheels. To reach this conclusion from the trial evidence, the majority relies exclusively on the testimony of Mr. Malek, a member of the Committee to Re-elect the President. This is hardly classifiable as even-handed appellate review.

Although the majority devotes several pages of the opinion to quoting the opening statement of plaintiff's counsel, the opening statement has no bearing on the issues relied on by the majority to vacate the jury verdict. The majority orders a new trial based on its perception of the evidence, presented at trial, not on whether the opening statement was either defective or prejudicial. The opening statement is not evidence and it can shed no light on whether the trial evidence established the connection between the political contributions and the government investigation. Rather than to quote from the opening statement, which is not used as a basis to grant a new trial, it is the majority's obligation to fairly deal with the evidence presented at

trial--the evidence set forth by Justices Morrison and Sheehy in their dissents.

REASONS GIVEN FOR THE INADMISSIBILITY OF THE EVIDENCE ARE ILLUSORY:

Why must the government investigation and political contribution evidence not reach the eyes and ears of the jury? The majority lists several reasons, and states in essence as to each that the jury was allowed to speculate with no evidentiary foundation, and therefore its conclusions are unfounded. I believe, however, that sufficient evidence was presented for the jury to fit the pieces together and reach its verdict assessing exemplary damages against Goodyear. I discuss each of the reasons listed by the majority, which are illusory at best.

What is so important, so vital in Mr. Malek's testimony that the majority orders a new trial and evidence to be excluded from the second trial? Malek, a member of the Committee to Re-elect the President, testified, according to the majority's summary, that <u>he</u> had <u>no</u> <u>knowledge</u> of situations in which "proceedings before any department or agency were interfered with, influence, or obstructed." Assuming the truth of this statement, it proves only that <u>Mr.</u> <u>Malek</u> had no knowledge of attempts by re-election committee members on behalf of Goodyear or other contributors, to influence government proceedings then pending. Malek's testimony does not exonerate the entire re-election committee, it does not exonerate the officials of the Department of Transportation, and it certainly does not exonerate the Goodyear officials.

On its face, and considered in an evidentiary vacuum, Malek's testimony establishes nothing for or against

plaintiff. But when considered with other testimony and evidence admitted at trial, Malek's testimony was not irrelevant. The jury was entitled to conclude, based on all the evidence, that Malek's testimony before the Ervin Committee was simply another effort to cover up and therefore should be given no weight. Or, alternatively, if the jury believed Malek's testimony before the Ervin Committee, the jury was entitled to conclude that Malek was walking through those times wearing a blindfolder and earplugs.

And now to the reasons given for the inadmissibility of the governmental investigation and political contribution evidence.

First, the majority says the jury was impermissibly allowed to speculate on the K-rim wheel investigation. Just what speculation was permitted of the jury, the majority doesn't say. But the majority says that speculation on the investigation was impermissible because Goodyear had voluntarily discontinued the manufacture of the K-rim wheels three years before the investigation and because at the time of the investigation the government didn't have the authority to order a wheel recall. This reasoning is baffling and misses the point. Voluntary discontinuing production of an item does not establish that the item already in the hands of the public was not defective and dangerous. Nor does the presence or absence of power to recall a product establish that the product already in the hands of the public was not defective. In fact, discontinuance or production may have been motivated by the conclusion that the product was both defective and dangerous to the public.

Nor does the presence or absence of governmental power to recall defective products bear on Goodyear's motives in

influencing a favorable governmental decision on the investigation. The undeniable fact is that the government did have the authority to investigate product defects and to require the manufacturer to notify the consumers who had come into possession of those products by the distributing efforts of the manufacturer. Here the situation is that the Department of Transportation did not order a notification campaign and in fact closed the investigation shortly after the re-election of the President. The totality of the evidence supported a jury inference that the investigation was closed because the campaign contributions had their intended effect.

Second, in concluding that the evidence impermissibly allowed the jury "to surmise, with no evidentiary support, that there was a White House Commitment before Goodyear made its contribution," the opinion relies entirely on the testimony of Malek before the Ervin Committee to establish this fact. (Emphasis added.) The Malek memorandum, however, was not offered to prove a pre-existing commitment from the White House to grant political favors to contributors. The memorandum spoke for itself: it simply suggested that the re-election functionaries were out to politicize the executive branch of government by using the enormous influence of governmental favors as the carrot.

It is odd indeed that although the majority relies entirely on the Malek memorandum as the impermissible evidence by which all the evidence was to be measured, not once does the majority discuss this evidentiary piece of evidence other than the reference to it in quoting from the opening statement of plaintiff's counsel. The majority overlooks the fact that the essential question at all times

was whether Goodyear made political contributions with an expectation of reaping favorable governmental action on issues close to Goodyear's pocketbook. It is not important whether the governmental officials, or those claiming to have the power to influence governmental decisions, committed themselves before or after the contributions. The motives and actions of the Goodyear officials were on trial, and the motives and actions could only be demonstrated by proof of governmental complicity. With Goodyear's actions as the focal point I have no doubt that the jury had before it a strong circumstantial case that Goodyear expected to reap handsome returns from favorable governmental action on the multi-rim wheel investigation. Who knows, had the investigation not been closed after President Nixon's re-election, possibly the very tire rim that exploded into Dennis Kuiper's head would not then have been in use.

Although evidence of attempts to influence an investigation by political contributions would be sufficient by itself for the jury to consider exemplary damages, here the plaintiff could only get the picture before the jury by revealing to the jury what the post-Watergate break-in investigation evidence disclosed. It was only through this evidence that the jury would have a more complete picture of what Goodyear had attempted to accomplish and in fact accomplished through its political contributions.

The third reason given for the inadmissibility of the political contributions and investigation evidence is that the jury was allowed to speculate from the evidence that unknown persons in the White House knew of and could attend to Goodyear's needs before the Department of Transportation. The majority states that a jury conclusion to this effect

would be wholly without foundation, but the fact is that the majority's statement is wholly without foundation. Only one fitted with blindfolders and earplugs could conclude that the Department of Transportation's decision to close the K-rim wheel investigation did not have direct or indirect White House influence.

Aside from the majority's ignoring the political realities, the reason assigned for excluding the evidence misses the point. The evidence against Goodyear was admissible regardless of whether it could be proved that specific White House personnel could accomplish Goodyear's objectives in the investigations pending before the Department of Transportation. The evidence certainly tended to prove Goodyear's ulterior motives in making its political contributions, and it is, after all, Goodyear's motives and conduct that form the basis for the jury to consider an award of exemplary damages. Whether or not Goodyear was successful in its efforts to influence government conduct by its political contributions is not necessary to an award of exemplary damages against Goodyear; but the evidence of Goodyear's success gave to the jury a more complete picture of the magnitude of the involvement and the harm created by the collusion of big business and big government.

The evidence without question permitted a jury inference that people in high places were looking out for the interests of Goodyear. Goodyear knew how strongly the government was focusing on the serious problems that the wheel rims posed for the public, and Goodyear's own people estimated a possible 145 million dollar cost to Goodyear. But then the Goodyear people went to work.

The evidence set forth by Justices Morrison and Sheehy, and that I have repeated in a different format in this dissent, surely gives rise to an inference that someone beyond the Department of Transportation influenced its decision to close the multi-piece wheel investigation. A serious safety problem is hardly handled properly from the standpoint of either the government or the public, when the government makes the decision to close the investigation before the safety problems become too widely publicized.

Fifth and finally, the majority declares that the evidence is inadmissible because it permitted the jury to improperly speculate that Andrew Detrick "closed the K-rim investigation differently than those closed by his predecessors." If there is evidence to suggest that Detrick followed standard operating procedures, and that Detrick was not influenced by improper motives, the majority do not suggest what it is. The evidence suggests, and the jury was entitled to believe, that improper political influence was the motivating factor behind the closure of the multi-piece wheel investigation.

Ample evidence exists in the record for the jury's assessment of exemplary damages against Goodyear. I would affirm the judgment.

Justice